FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2010 JUL -8  P 1:59

CLERK'S OFFICE
AT BALTIMORE
BY ____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : CRIMINAL NO. |
| | : |
| IRIKA SHIPPING S.A. | : |
| | : |
| Defendant | : |
| | : |

...oooOooo...

## JOINT FACTUAL STATEMENT

The United States of America and the Defendant, Irika Shipping, hereby agree that this Joint Factual Statement is a true and accurate statement of the Defendant's criminal conduct, that it provides a sufficient basis for the Defendant's plea of guilty to the charges contained in the Criminal Information in the above captioned matter and as set forth in the plea agreement signed this same day, and had this matter proceeded to trial, the United States would have proven the facts contained in this Joint Factual Statement beyond a reasonable doubt.

I.   Background

Irika Shipping (hereinafter "Irika Shipping" or "Defendant") is a Panamanian registered corporation with its headquarters office located in Greece. Irika Shipping was the operator and technical manager of the *M/V Iorana*, a 40,170 gross ton ocean-going bulk carrier cargo ship built in China and completed in June 2009. The *M/V Iorana* was approximately 738 feet in length, was registered in Greece, and had an International Maritime Organization (IMO) number of 9465796. Irika Shipping managed approximately 8 ships, each owned by a separate corporation. Irika Shipping managed all aspects of the *M/V Iorana* under the terms of an agency agreement for Katerina Maritime S.A., the ship's owner. In pleading guilty, Defendant Irika Shipping acknowledges that it is liable for the acts and omissions of its agents and employees acting within the course

and scope of their agency and/or employment and for the benefit of the Defendant.

The investigation into the *M/V Iorana* was launched upon the ship's arrival in Baltimore, Maryland and after a crew member passed a note to the Customs and Border Protection inspector alleging that the ship's Chief Engineer had directed the dumping of waste oil overboard through a bypass hose that circumvented required pollution prevention equipment required by law. CBP forwarded the information to the U.S. Coast Guard which conducted an inspection on January 8-9, 2010. The crew member who wrote the note had taken photographs of the illegal activities on board with his cell phone and when the Coast Guard boarded the vessel, provided them with the bypass hose and flanges that had been used on the ship. The note, dated December 29, 2009, when the ship was at an anchorage in Chesapeake Bay and prior to the inspection, stated:

> To any authorities concerned,
>
> This is to inform you of illegal discharging of oily water from the bilge tank, which was happen last December 14 and 17 of December 2009.
>
> The Chief Engineer instructed as to make a bypass flange to discharged oily water through auxiliary boiler blowdown overboard, using a bypass hose.
>
> We are asking help to any authorities concerned about this, because we must protect our environment and our marine lives.

During the Coast Guard's inspection, a bypass hose and associated flanges made at the direction of the Chief Engineer were found. The bypass system had been used to discharge overboard through the boiler blow down system where any trace of oil could be expected to be steam cleaned away. Information supplied from crew members indicate that a total of approximately 23 cubic meters of oil contaminated sludge and bilge waste was dumped overboard on two different nights on the voyage to Baltimore and then concealed by false and fictitious entries in the Oil Record Book, a required log book in which all internal transfers and overboard discharges of waste oil are to be recorded.[1]

---

[1] The Act to Prevent Pollution from Ships ("APPS"), makes it a crime to knowingly violate the MARPOL Protocol, an international treaty that regulates pollution from ships, or a series of

The falsification of records concealed the fact that the brand new Oily Water Separator,[2] a required pollution prevention device designed to limit the oil content of overboard discharges to 15 parts per million oil, was not able to process the ship's oily waste. As revealed by the government's investigation, other unlawful discharges of oil-contaminated bilge waste had been made from the ship without the use of the Oily Water Separator since the first voyage. As a result and as set forth below, the ship made and used a false and fictitious Oil Record Book during prior port calls in Tacoma,

---

similar regulations promulgated pursuant to APPS. 33 U.S.C. § 1908(a). The 1973 International Convention for the Prevention of Pollution From Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution From Ships, 1973, are commonly referred to as the "MARPOL Protocol" or "MARPOL 73/78." The MARPOL Protocol established the international standard that discharges of bilge waste must contain less than fifteen parts per million oil. Under the APPS regulations, each oil tanker of 150 gross tons or more or non-tanker vessel of more than 400 gross tons must maintain a record known as an Oil Record Book. 33 C.F.R. § 151.25.(a). Entries must be made in the Oil Record Book for certain engine room operations including the disposal of oil residue or the discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces. 33 C.F.R. § 151.25(d). All accidental, emergency or other exceptional discharges of bilge waste or oil must be recorded in the ORB along with the reason for the discharge. 33 C.F.R. § 151.25(g). Each of these engine room operations, including the overboard discharge of bilge waste, is required to be fully recorded without delay in the Oil Record Book. 33 C.F.R. § 151.25(h). The entries are to be signed by the person or persons in charge of the operation and each completed page must be signed by the Captain of the ship. 33 C.F.R. § 151.25(h). These regulations apply to foreign-flagged ships when they are in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States. 33 C.F.R. § 151.09. It is widely known within the maritime industry that the U.S. Coast Guard regularly inspects the Oil Record Book during ports state inspections to determine compliance with U.S. law and the MARPOL Protocol and to assure that ships are not an environmental threat to U.S. ports and waters.

[2]Engine room operations on vessels like the *M/V Iorana* generate large quantities of waste oil. Waste oil generated through leaks and dripping of oil, together with water, detergents, solvents, and other wastes, accumulate in the bottom or the "bilge" of the vessel. This liquid is collected, stored, and then processed to separate the water from the oil and other wastes using a pollution prevention control device known as an Oil Water Separator. After passing through the Oil Water Separator, bilge waste containing less than fifteen parts per million of oil may be discharged overboard. Engine room operations also continuously generate waste oil and sludge. Such waste can either be incinerated or offloaded on shore so that it can be disposed of in an environmentally responsible manner. This investigation involves the alleged discharge of both oil contaminated bilge waste and waste oil or sludge.

Washington, and New Orleans, LA.

The overboard discharges violate MARPOL, a widely accepted international law treaty to which the United States is a party that requires discharges be made through operating Oily Water Separator equipment and contain concentrations of less than 15 parts per million oil. Had the Coast Guard known the truth – that required pollution prevention equipment was being intentionally circumvented and that official ship records were being deliberately falsified – the agency could have detained the ship, refused port entry and required repairs. One benefit of Defendant's MARPOL related crimes was financial.

Irika Shipping was also the operator of the *M/V Irika*, a ship that was the subject of a similar prosecution in 2006 – 2007 in Tacoma, Washington. The owner of the vessel, Irika Maritime, S.A. pleaded guilty in *United States v. Irika Maritime S.A.* (W.D.WA No. CR06-5661RBL). According to a joint factual statement contained in the plea agreement, the facts of that case were similar: deliberate dumping of waste oil and use of a "magic pipe" to discharge waste without the use of required pollution prevention equipment and then falsification of official log books to conceal pollution. Irika Maritime and the ship's Chief Engineer, Ilias Dimitriou Ntais, an employee of Irika Shipping, pleaded guilty. As part of the sentence, both Irika Maritime and Irika Shipping were required to develop and implement an Environmental Compliance Plan which would apply to the entire fleet of vessels managed by Irika Shipping, including new vessels such as the *M/V Iorana*. Sentencing took place on January 24, 2007, and the defendant was sentenced to a criminal fine, organizational community service and four years probation. At the time of the offenses in this case, and as of this date, Irika Maritime was and remains on probation in the Western District of Washington and Irika Shipping was bound to those terms of probation.

II.   M/V Iorana

The *M/V Iorana* was built in China and completed in June 2009. Its first voyage was to Tacoma, Washington. The Chief Engineer from June 10, 2009, to December 5, 2009, was Ilias Dimitriou Ntais, who had been convicted in the prior prosecution in 2007 in the Western District of Washington involving Irika Shipping. While Irika Shipping decided to continue to employ  Chief Engineer Ntais, there is no record that he was disciplined or provided any additional training or oversight. The ship was operating on an interim International Safety Management Code certificate and did not have any budget or environmental budget. Irika Shipping similarly did not have a company budget. Prior

to leaving port, the crew of the Iorana received little training regarding the company's environmental policies. They were not informed by the company that it had previously been involved in an environmental crimes prosecution and was supposed to be operating under a Court imposed Environmental Compliance Program.

A.   Record keeping and Waste Management

During the first voyage from China to Tacoma, between June 11, 2009, to June 26, 2009, the Oily Water Separator was used to make an overboard discharge starting during the evening of June 21, and continuing until the early morning hours of June 22, 2009. According to the data recorded by the Oil Content Monitor, there were frequent alarms. However, the Oil Record Book contains no entry reflecting this discharge and no record was made regarding the difficulty encountered with the use of the Oily Water Separator or the failure of monitoring equipment. As a result, the Oil Record Book examined by the Coast Guard in Tacoma, WA during an inspection on or about June 30, 2009, was not accurate or complete.

Under Chief Engineer Ntais, sludge contaminated waste water was drained from the incinerator waste oil tank to the bilge tank thereby contaminating that tank. The oil and sludge in the bilge tank made it difficult to operate the Oily Water Separator without numerous alarms indicating that it contained in excess of 15 ppm oil. Ordinarily, it would be expected that the bilge water pumped to the bilge tank would be relatively clean, especially on a new vessel. The Oily Water Separator is intended to process liquids containing mostly water and not heavy concentrations of oil. The sludge was created on board the vessel from the need to constantly purify the heavy fuel oil used to run the ship. Sludge was stored in the separated oil tank before being pumped to the incinerator waste oil tank where it is then heated to separate out any "water." The goal of draining the "water" from the sludge was so that it could be incinerated aboard the ship. In reality, the waste drained to the bilge tank was not water, but rather looked and appeared like oil and contained high concentrations of oil. By draining the liquid to the bilge tank, the result was that the bilge tank became heavily contaminated with substantial quantities of sludge and oil. According to certain crew members, Chief Engineer Ntais modified the funnel and piping from the incinerator waste oil tank to the pipe which runs to the bilge tank so that it was a larger diameter, thereby resulting in even greater contamination.

Ship records show that despite the fact that the vessel was brand new, the bilge tank on the ship contained significant quantities of oil. For example, on July 13, 2009, the Master sent an email to the shore-side office in Greece seeking assistance in

offloading both sludge and bilge water and stating "FR YR INF ... BILGE WATER TNK IS DIRTY (CONTAIN OIL/FO). The Oil Record Book contains entries claiming proper use of the Oily Water Separator at 15 ppm or below and contains no entries of exceptional discharges or the failure of monitoring equipment.

B. Direct Discharges

While the ship was transferring oily waste into the bilge tank, it was not transferring all of the machinery space bilge water into this tank. Instead, after encountering frequent alarms when using the Oily Water Separator on its first voyage from China to Tacoma, Chief Engineer Ntais, on subsequent voyages, ordered that the bilges should be discharged directly overboard. This was done and on a regular and routine basis by the Second Engineer. The Chief Engineer had alarms in his cabin and would give the order to pump the bilges directly overboard without first being stored in any tank and without processing by the Oily Water Separator. Directly discharging the bilge waste overboard was accomplished using the general service pump, a large capacity pump available for emergencies and unlocking a padlock on certain valves. On the first voyage, the ship had additional seals on some of these valves in order to prevent circumventing the Oily Water Separator. The seals were required under the Environmental Compliance Program mandated by the prior prosecution. However, after the first voyage, Chief Engineer Ntais directed that the seals be removed in order to allow this method of direct discharge which then continued. The direct discharges were done at night, when the ship was not close to land, and were not recorded in the Oil Record Book.

C. Bypassing

Chief Engineer Ntais signed off the ship on December 5, 2009, and was replaced by Chief Engineer Triantafyllos Marmaras, who has pleaded guilty in a related case to obstruction of justice charges. *United States v. Triantafyllos Marmaras* (D.MD Criminal Case No. JFM-10-0248). While Ntais told the new Chief Engineer that the Oily Water Separator needed cleaning, his written transition report indicated that all systems, including the Oily Water Separator, were in good working order. Marmaras had not previously worked for Irika Shipping SA and was not advised of the company's prior conviction. Chief Marmaras was not informed that Irika Shipping was supposed to be operating pursuant to a Court-approved Environmental Compliance Plan imposed as a condition of probation in the prior criminal prosecution nor was he advised of any particular or unique company policies regarding the operation and maintenance of pollution prevention equipment.

The Chief Engineer and Master discussed the need to offload oily waste in port prior to the ship's voyage from Gibraltar to Baltimore. On December 12, 2009, prior to leaving from Gibraltar to Baltimore, the ship was expected to off-load 20 cubic meters of sludge, while only 13 cubic meters of sludge were actually removed from the separated oil tank. No bilge water was removed. When the ship departed for Baltimore on or about December 13, 2009, there was approximately 20 cubic meters of oily water in the bilge tank. The bilge tank had a capacity of 24 cubic meters.

After speaking with subordinate crew members and examining the Oily Water Separator, the new Chief Engineer determined that the Oily Water Separator was not working because the Oil Content Monitor designed to detect oil in concentrations greater than 15 ppm was alarming constantly and shutting down the system. He also learned that the bilge tank had a significant quantity of oil in it due to the draining of oily waste from the incinerator waste oil tank by the prior Chief Engineer. According to crew members, the prior Chief Engineer had modified the funnel and piping leading from the waste oil incinerator tank to the piping leading to the bilge tank. As a result of the prior Chief Engineer's practice of draining "water" from the sludge in the waste oil incinerator tank, a substantial amount of oil and sludge had been drained into the Bilge Tank. The oil and sludge in the bilge tank made it more difficult to operate the Oily Water Separator without numerous alarms indicating that it contained in excess of 15 ppm oil.

Chief Engineer Marmaras ordered a Wiper to weld together two flanges that together with a hose were then used to bypass the Oily Water Separator and discharge overboard the contents of the bilge tank, which he and the crew knew contained oil. In pleading guilty, Chief Engineer Marmaras has made a sworn statement indicating that he informed the Master of his plan to use the bypass before it was used and the Master did not object. The hose was borrowed by the engine room crew from the deck department. One end was connected to the bilge pump and the other end was connected to the boiler blowdown overboard valve. Since the 103 foot hose was needed by the Deck Department, it was not cut to fit the distance between the bilge pump and the boiler blowdown overboard valve, but rather, was run all the way around the main engine.

At Marmaras' direction, the contents of the bilge tank were pumped overboard through the bypass and without the use of the Oily Water Separator on or about the nights of December 14 and December 17, 2009. A total of approximately 23 cubic meters of oil contaminated waste was discharged overboard. The bypass was used at night in order to conceal the illegal conduct. After each of the overboard discharges, seawater was pumped through the bypass in order to remove any trace of oil. This was done at the direction of

the Chief Engineer. There are no allegations and no records suggesting that the bypassing was done at the explicit direction of shore-based supervisory personnel.

D.    Discharge of Oily Rags and Plastic Garbage

During the voyage to Baltimore, the Chief Engineer ordered the crew to clean out the bilge tank. The walls of the bilge tank were coated with a thick and dark layer of oil and sludge. Two crew members worked on and off in rough seas to clean the walls with rags soaked in diesel fuel, which acted as a solvent. Before the work began, a fan was placed in the hatch of the tank in order to remove any noxious fumes. Irika Shipping's safety management system required a work permit for any confined space entry that was signed by the safety officer and the workers and that would specify the required safety procedures, including taking a reading of oxygen levels within the tank. This work was performed without a work permit as required by the ship's safety management system. As a result, the required log of work permits was not complete.

The cleaning of the bilge tank with rags and diesel fuel generated at least five plastic bags full of oil soaked rags. Because the rags were heavy, double bags were used. The bags were carried from the engine room up to the deck of the ship. Two crew members, both wipers, dumped the plastic bags full of oily rags overboard on two different evenings. Neither the Oil Record Book or the vessel's Garbage Record Book contains any entry indicating the disposal of plastic bags and oily rags overboard. MARPOL Annex V prohibits the discharge of plastic and Annex I prohibits the discharge of oil.

E.    Obstruction of Justice – Concealment and Evidence Tampering

After the bypass was used, and before the ship reached the Port of Baltimore, the Chief Engineer ordered the crew to repaint the pipes and flanges where each end of the bypass had been connected. This work was performed by the Wipers. The purpose of painting the areas where the bypass had been connected was to hide wrench marks caused by connecting and disconnecting the bypass so as to conceal the illegal conduct from the Coast Guard. Photographs of the bypass taken on the Wiper's cell phone confirm that the pipes and flanges were repainted before the ship arrived in Baltimore.

The Oil Record Book of the *M/V Iorana* contained entries made by the Chief Engineer with each page being signed by the Master as required, as well as being countersigned by the Second Engineer and Third Engineer. Chief Ntais made entries, but

the signature line at the bottom of each page calling for his signature is blank. The Oil Record Book contains no entries regarding the dilution with fresh water or the direct discharges overboard using the general service pump that took place while Ntais was on board. Similarly, there are no entries documenting the illegal discharges that took place on or about December 14 and 17, 2009, when Marmaras was Chief Engineer. As a result, a false and fictitious Oil Record Book was used on all three United States port calls made by the *M/V Iorana* when the ship was inspected by the Coast Guard: June 30, 2009 (Tacoma, Washington); August 24, 2009 (New Orleans, LA); January 8, 2010 (Baltimore, Washington).

The Oil Record Book contains an affirmatively false entry on December 20, 2009, indicating that 23 cubic meters of bilge waste had been pumped overboard through the Oily Water Separator. The Chief Engineer made this entry so it would appear that there was a legitimate discharge of the waste that had been illegally discharged through the bypass. The Chief Engineer also used the Oily Water Separator on or about the same day to process sea water and generate alarms that he knew would be recorded by the oil separator's computer and oil content monitor. He understood that by operating the Oily Water Separator on this day, it would conceal the illegal discharges that had occurred and corroborate the false entry in the Oil Record Book in the event that the ship was inspected by the U.S. Coast Guard in Baltimore. Meanwhile, the Wipers maintained a rough sounding log that recorded the actual tank volumes and which confirms that discharges were made from the bilge tank on December 14 and 17, 2009. Prior to the ship's arrival in Baltimore, the Chief Engineer signed the name of the Third Engineer in the Oil Record Book without his authority, because the Third Engineer was unavailable. Meanwhile, throughout the voyage, the Chief Engineer ripped out and destroyed all pages of the engine room sounding log book.

The Chief Engineer told the Master about making this false entry in order to conceal the bypassing. Despite having learned about the bypassing and the false entry to cover it up, the Master signed every page of the Oil Record Book, including the pages that failed to disclose the illegal discharges and the page that contained the false entry on December 20, 2009, and also presented the Oil Record Book to the Coast Guard in Baltimore.

F.  Obstruction of Justice – Witness Tampering

The M/V Iorana was inspected by the U.S. Coast Guard in Baltimore on January 8, 2010. Based upon information provided by certain crew members, the Coast Guard

learned the location of the bypass flanges and hose that had been used to make overboard discharges. During this inspection, the Master and the Chief Engineer both falsely denied knowledge of the bypassing. The Master had previously learned about the bypassing. According to the Chief Engineer, the Master and Chief Engineer engaged in other obstructive acts. For example, the Coast Guard interviewed witnesses in a room adjacent to the Master's office. The Master and Chief Engineer spoke to several witnesses immediately prior to their interview. During these conversations, while waiting to be interviewed by the Coast Guard, the Electrician and a Wiper were told not to tell the Coast Guard about the bypassing and to say that the bypass hose and flanges came from the Chinese shipyard. According to two other crew members, they were pressured by the Master not to tell the truth.

The Chief Engineer met with the Second Engineer and Third Engineer in the engine control room before their interviews and gave them similar commands. The Chief Engineer also told a crew member to hide a cup holding the oil that was leaking from the boiler pump to avoid detection should the Coast Guard decide to inspect that area of the ship.[3] One crew member, following what he understood to be the wishes of Master and Chief Engineer, asked other crew members to lie. While the Coast Guard inspectors disembarked, the Chief Officer visited the engine room twice and instructed the Electrician to lie to the Coast Guard.

During the Coast Guard inspection, the Master, Chief Engineer and other crew members were asked to prepare written statements. The Chief Engineer submitted a false and misleading statement to the Coast Guard. It was prepared in the presence of the Master and read out loud to the Master before it was submitted to the Coast Guard. The Chief Engineer's written statement falsely indicated that the bypass hose and connections came from China. In making this statement, Chief Engineer intended to supply a false, innocent explanation for the existence of the bypass, despite the fact that the connections were fabricated on board the ship.

Sincerely,

---

[3] The shaft of the fuel oil pump that operates the ship's boiler broke on or about December 21, 2009. It was temporarily repaired with the shaft from the incinerator pump which leaked a small amount of oil. The boiler pump was not repaired until after the ship left Baltimore on January 15, 2010. The Coast Guard was not notified about this issue.

| | |
|---|---|
| ROD J. ROSENSTEIN<br>UNITED STATES ATTORNEY<br>DISTRICT OF MARYLAND | IGNACIA S. MORENO<br>ASSISTANT ATTORNEY GENERAL<br>ENVIRONMENT & NATURAL<br>RESOURCES DIVISION |
| By: _/s/ P. Michael Cunningham_  7/8/10<br>P. MICHAEL CUNNINGHAM   Date<br>Assistant U.S. Attorney | By: _/s/ Richard A. Udell_  7/8/10<br>RICHARD A. UDELL   Date<br>Senior Trial Attorney<br>Environmental Crimes Section<br>U.S. Department of Justice |
| JENNY A. DURKAN<br>UNITED STATES ATTORNEY<br>WESTERN DISTRICT OF WASHINGTON | JIM LETTEN<br>UNITED STATES ATTORNEY<br>EASTERN DISTRICT OF LOUISIANA |
| By: _/s/ James Oesterle_  7/8/10<br>JAMES OESTERLE   Date<br>Assistant U.S. Attorney | By: _/s/ Dorothy Taylor_  7/8/10<br>DOROTHY TAYLOR   Date<br>Assistant U.S. Attorney |

As an authorized representative of Defendant Irika Shipping, S.A., I have read this Joint Factual Statement and carefully discussed every part of it with criminal defense counsel for Irika Shipping I hereby stipulate that the above Joint Factual Statement is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

SIONIDIS CHRISTOS  /s/   18-06-2010.
Authorized Representative     Date
Irika Shipping, S.A.
Defendant

I am counsel for Irika Shipping, S.A. I have carefully discussed every part of this Joint Factual Statement with the authorized representatives of Irika Shipping. To the best of my knowledge it is a true and accurate factual statement and provides a sufficient factual basis for charges set forth in the Criminal Informations and Irika Shipping's guilty pleas as set forth in the Plea Agreement.

_____  6/18/10
Dimitri P. Georgantas            Date
Defense Counsel
Irika Shipping, S.A.